No. 04-486

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 233N

IN RE THE MARRIAGE OF

MARY REATHA PETERS,
n/k/a MARY REATHA SMITH,

      Petitioner and Appellant,

   and

ROY LOUIS PETERS,

      Respondent and Respondent.


APPEAL FROM:    The District Court of the Tenth Judicial District,
                In and For the County of Fergus, Cause No. DR 2002-110,
                Honorable E. Wayne Phillips, Presiding Judge


COUNSEL OF RECORD:

      For Appellant:

           James C. Reuss, Guthals, Hunnes, Reuss & Thompson, P.C.,
           Billings, Montana

      For Respondent:

           Vernon E. Woodward and Jo Messex Casey, Hendrickson, Everson,
           Noennig and Woodward, P.C., Billings, Montana


                      Submitted on Briefs:  January 11, 2005

                             Decided:  September 14,
2005


Filed:

              _____
                          Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent. It shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number and result in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Mary Reatha Peters (Reatha) appeals the order entered in the Tenth Judicial District Court, Fergus County, granting the Respondent's, Roy Louis Peters (Roy), Motion to Modify/Interpret Property Settlement Agreement and denying Reatha's Motion to Enforce Final Decree. We affirm in part and reverse in part.

¶3 We consider the following issues:

¶4 Did the District Court err in its post-judgment interpretation of the property settlement agreement?

¶5 Is the Respondent entitled to attorney fees on appeal?

BACKGROUND

¶6 In the process of dissolving their marriage and after mediation regarding division of assets, Reatha and Roy entered in to a Property Settlement Agreement (PSA) on November 14, 2003. The District Court incorporated the agreement into its Final Decree of Dissolution entered on November 19, 2003. The PSA stated that "upon the termination of this marriage, the net marital estate shall be divided as hereinafter set forth" and then provided that each party was entitled to "[o]ne half the value of" four named brokerage accounts.

2

¶7     The brokerage accounts included a Metropolitan securities account, an account with Edward Jones (part of which was an annuity), a Smith Barney account, and a DA Davidson account.  At the time of the agreement and until Roy's receipt of a letter dated January 6, 2004, from Summit Securities, Metropolitan's parent company, both parties understood the value of the Metropolitan account was $124,019.

¶8     On December 18, 2003, Roy sent Reatha a letter containing the following statements:

> Based on our Settlement Agreement, Roy is to pay Reatha a total of $466,083.50.  Roy proposes to transfer his annuity, valued at $212,292.84, to Reatha.
>
> . . . .
>
> Roy will pay the difference, $253,790.66, in cash.  Roy will sell the necessary securities to generate the cash and absorb the entire obligation for whatever taxes are due.

On December 23, Reatha accepted the proposal, subject to the "formality" of reviewing the annuity contract.  Both parties subsequently acknowledged that this contingency was satisfied.

¶9     On January 27, 2004, after receiving notification from Summit Securities that the Metropolitan investment was worthless, Roy sent another letter to Reatha explaining this development and his observation that the investment had apparently been worthless since before the date of the settlement agreement.  Roy made the following adjustments to the calculation of the amount he believed he owed Reatha, taking into account the decrease in value of the Metropolitan account as well as another new development–an increase in value

3

of the annuity he had agreed to transfer–which he deemed a benefit to Reatha that he could offset against the amount of cash he was to pay, as follows:

| | |
|---|---:|
| Amount due: | $466,083.50 |
| Annuity value at transfer: | 224,660.00 |
| Less Summit | 50,000.00 |
| Cash owed | $191,423.00 |

Pursuant to these calculations, Roy sent a check to Reatha for $191,423.00. On February 3, 2004, Roy transferred the annuity, then valued at $224,972.33, to Reatha.

¶10 Reatha responded with a letter objecting to Roy's assumptions, stating that Roy owed her $253,790.66 in cash as set forth in Roy's letter of December 18, 2003, and that, taking into account the check he had sent, Roy owed her an additional amount of $62,367.66. In addition, Reatha stated the following:

> I obviously do not agree with your contention that the value of the annuity was to be established at the time of transfer. Also, Roy's proposal to pay $253,790.66 in cash was not conditioned upon the status or value of his Summit investment (or anything else, for that matter).

¶11 Roy then filed a Motion to Modify/Interpret Property Settlement Agreement, asserting that each party would be entitled to half the value of the brokerage accounts as of the date of the agreement, November 14, 2003, except that the actual value of the Metropolitan account should be recorded as zero and the value of the annuity set as of the time of transfer to Reatha. In response, Reatha filed a Motion to Enforce Final Decree, requesting the District Court to compel Roy to pay her the additional sum of $62,367.66. The District Court granted Roy's motion and denied Reatha's motion. Reatha now appeals.

4

¶12   This Court interprets "property settlement agreements associated with marital dissolutions in accordance with the law of contracts." *In re Marriage of Pfennigs*, 1999 MT 250, ¶ 13, 296 Mont. 242, ¶ 13, 989 P.2d 327, ¶ 13; *see also* § 40-4-201(5), MCA.  Whether an ambiguity exists in such an agreement is a question of law. *Pfennigs*, ¶ 13.  An ambiguity exists when the agreement taken as a whole is reasonably subject to two different interpretations. *Pfennigs*, ¶ 13.  We review a district court's legal conclusions to determine whether its interpretation of the law is correct. *Pfennigs*, ¶ 13.

DISCUSSION

**¶13   Did the District Court err in its post-judgment interpretation of the property settlement agreement?**

¶14   Reatha argues that the December 18, 2003, letter and her subsequent acceptance of it amended the PSA and that, from that point on, Roy assumed all of the risk of any market fluctuation in the value of the securities in the brokerage accounts.  Thus, she asserts that she was entitled to receive the increased value of the annuity, but that Roy's obligation to her cannot be reduced by the amount lost in the Metropolitan investment.

¶15   Roy responds that the December 18 letter was merely a means of implementing the PSA and that no amendment of the agreement occurred.  He acknowledges, however, that he made a miscalculation in that letter.  Roy had subtracted $50,000 from the amount he owed Reatha in order to account for half of the loss of the Metropolitan investment, but explains that the correct amount should have been $62,009.50, or one half of the

investment's agreed former value of $124,019. Therefore, Roy's position is that he actually overpaid Reatha by the difference, or $12,009.50. Roy maintains that the PSA required him to pay Reatha one half of the value of the brokerage accounts as of the date of the agreement, and that, because there was a mutual mistake of fact about the value of the Metropolitan account, both sides must bear the loss equally.

¶16    Reatha counters that in his January 27 letter, Roy reduced (by about $12,000) the amount of cash he owed to Reatha to offset an increase in the value of the annuity which had occurred since November 14. Thus, she argues that Roy could not have intended that the value of the accounts should be fixed on November 14, but, rather, he only intended that the proportion owed to each party was then fixed. According to Reatha, the actual amount was fixed upon the amendment to the PSA accepted by her on December 23. Under the terms of this claimed amendment, Roy was required to transfer the annuity to Reatha at its increased value and also owed her $253,790.66 in cash. Accordingly, Reatha contends that Roy owes her the additional sum she claimed in the District Court of $62,367.66.[1]

¶17    Faced with these arguments, the District Court concluded that Roy's December 18, 2003, letter had not modified the PSA, but was a method of implementing the PSA, because by its own terms it was to be "[b]ased on our Settlement Agreement." The District Court thus concluded that Roy and Reatha bore the loss of value in the Metropolitan account equally, but that only Roy was entitled to the benefit from the gain in the annuity's value

---

[1]It should be noted that neither party alleges that obligations from the Smith Barney account, the DA Davidson account, or the non-annuity portion of the Edward Jones account have not been satisfied.

because that gain "does not implicate the underlying agreement and no additional money should change hands either way."

¶18     We conclude that the District Court was largely, but not entirely correct. The PSA fixed the proportion of the investment accounts to which the parties were entitled at 50 percent each. As the District Court aptly noted, "[t]he Agreement provided that these [i.e., the brokerage accounts in question] and other securities would be split equally between the parties. No precise agreement was reached on how such a division would be accomplished . . . ." Because the calculations therein were "based on" the PSA, the December 18 offer and subsequent acceptance does not appear to have been a modification of the PSA, but merely a proposal for implementing it. Consequently, we cannot conclude from the letter and its acceptance that either party thereby relinquished the risk of loss in the underlying accounts or that either party exclusively retained the potential for gain in the accounts. Indeed, there never seems to have been an understanding between the parties that the benefits and obligations that specifically arose from the Metropolitan account and the Edward Jones-held annuity were resolved. Therefore, we conclude that both parties continued to bear the financial risks associated with these accounts after the PSA fixed their interests at 50 percent each.

¶19     As a result, when the Metropolitan account value became worthless, as the parties acknowledge it has, both Roy and Reatha lost equal amounts of equity. Likewise, when the annuity gained in value before the transfer on February 3–here we disagree with the District Court–each party shared in those gains.

7

¶20    In order to properly allocate the shared gains and losses between the parties, we return to the implementation plan in the December 18 letter in which the parties agreed on the amount Roy was to pay Reatha, except for the treatment of the Metropolitan account and the annuity. There, Roy was to assign the annuity, then valued at $212,292.84, to Reatha and pay her $253,790.66 in cash, for a total of $466,083.50.

¶21    To take into account the gains and losses of each party, we first subtract one half of the value lost in the Metropolitan account, or $62,009.50, from $466,083.50. In this way, Reatha's portion of the financial loss is subtracted from her distribution. Then, we add one half of the gain in the annuity between December 18 and the actual transfer date of February 3, which is $6,339.75. Thus, Reatha's share of the gain is added to her distribution. The resulting sum is $410,413.75 and is the total amount Roy owed Reatha.

¶22    Reatha received the annuity when it was valued at $224,972.33. She also received a check from Roy for $191,423.00, which amount was based on Roy's erroneous calculations of both the Metropolitan loss and the effect of the annuity's gain. *See* ¶ 9. These two transfers from Roy to Reatha totaled $416,395.33. Therefore, Roy overpaid Reatha by $5,981.58.

¶23    The above calculations can be graphically represented as follows:

| | | |
|---|---|---|
| Amount parties agreed was due to Reatha | | $466,083.50 |
| Loss in Metropolitan account | $124,019.00 | |
| One half of Metropolitan loss | | -$ 62,009.50 |
| | | |
| Annuity value as of transfer on February 3 | $224,972.33 | |
| Annuity value as of December 18 | $212,292.84 | |
| Gain in annuity value | $ 12,679.49 | |
| One half of annuity gain | | +$ 6,339.75 |
| | | |
| Total amount Roy owed Reatha | | $410,413.75 |
| | | |
| Annuity value as of transfer on February 3 | $224,972.33 | |
| Check Roy sent to Reatha | $191,423.00 | |
| Total amount Roy transferred to Reatha | | -$416,395.33 |
| | | |
| Overpayment by Roy | | ($ 5,981.58) |

¶24 Although Roy argued, in opposition to Reatha's claim that she was entitled to an additional $62,367.66, that he had overpaid Reatha by over $12,000 in miscalculating the amount of the Metropolitan loss, he did not cross-appeal nor seek repayment. Thus, although we conclude that he overpaid Reatha, albeit in an amount less than he claimed, his failure to cross-appeal or seek repayment precludes us from ordering any relief in that regard.

¶25 We conclude that the District Court was correct to allocate the loss of value in the Metropolitan account to each party equally. Though we also conclude that the District Court erred in allocating the gain from the annuity's increased value only to Roy, it is not necessary, for the reasons set forth herein, that any relief be ordered.

¶26 **Is the Respondent entitled to attorney fees on appeal?**

¶27 We conclude that an award of attorney fees is not appropriate.

9

¶28    Affirmed in part and reversed in part.


/S/ JIM RICE


We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON
/S/ PATRICIA O. COTTER
/S/ BRIAN MORRIS